# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 15, 2012

Lyle W. Cayce
Clerk

No. 11–50682

PALADIN COMMUNITY MENTAL HEALTH CENTER; SHERRY OSTEEN,

Plaintiffs – Appellants

v.

KATHLEEN SEBELIUS, in her official capacity as Secretary of Health and Human Services; DR. DONALD BERWICK, in his official capacity as the Administrator of Centers for Medicare and Medicaid Services,

Defendants – Appellees

Appeal from the United States District Court
for the Western District of Texas

Before JOLLY, DeMOSS, and STEWART, Circuit Judges.

HAROLD R. DeMOSS, JR., Circuit Judge:

This appeal involves a challenge to the 2011 Medicare payment rate set by the Secretary of Health and Human Services (the "Secretary") for partial hospitalization services. Paladin Community Mental Health Center and Sherry Osteen (collectively, "Paladin") claim the Secretary's use of both hospital-based and community mental health center cost data in establishing and adjusting the 2011 relative payment weights and ultimate payment rate was in excess of her statutory authority. Without first presenting an administrative claim, Paladin filed suit in district court, alleging jurisdiction was proper under 28 U.S.C. § 1331. After a hearing, the district court concluded that Congress expressly

No. 11-50682

precluded judicial review of the Secretary's payment rate decisions and dismissed the case for lack of subject matter jurisdiction. We affirm.

## I.

## A.

The Medicare Act establishes a health insurance program for elderly and disabled persons. *See* 42 U.S.C. § 1395 *et seq*. Medicare Part A provides coverage for inpatient hospital services and institutional care, *see* §§ 1395c to 1395i–5, while Medicare Part B provides supplemental coverage for physician and outpatient department services. §§ 1395j to 1395w–4. Both hospitals and community mental health centers are eligible to receive Medicare Part B payments for certain qualifying outpatient services, including partial hospitalization program services. *See* §§ 1395x(s), 1395x(ff)(1)–(3). Paladin is a Medicare-certified community mental health center which provides partial hospitalization services to patients in and around Austin, Texas, and derives over 80% of its revenue from Medicare payments.

For years Medicare paid suppliers of partial hospitalization services based on their specific costs. However, in 1997, in an attempt to better control costs and encourage more efficient delivery of care, Congress directed the Secretary to establish an outpatient prospective payment system where providers would be paid predetermined rates for partial hospitalization services. *See* § 1395l(t)(1). In creating the new payment system, the Secretary was required to (i) develop a classification system for covered services and groups of services, and then (ii) "establish relative payment weights for covered [outpatient department] services . . . based on median (or, at the election of the Secretary, mean) hospital costs" using recent cost data. § 1395l(t)(2)(A)–(C). In any given year, the ultimate payment rate for covered services was the product of a "conversion factor" and the various "relative payment weight[s,]" § 1395l(t)(3)(C)–(D), adjusted geographically based on local labor costs and other factors. § 1395l(t)(4).

No. 11-50682

In 2000, the Secretary established the outpatient prospective payment system using a "per diem" methodology and then calculated the initial relative payment weights and ultimate payment rate for partial hospitalization services. Thereafter, the Secretary was instructed to

> review not less often than annually and revise the groups, the relative payment weights, and the wage and other adjustments described in paragraph (2) to take into account changes in medical practice, changes in technology, the addition of new services, new cost data, and other relevant information and factors.

§ 1395l(t)(9)(A).[1] The Secretary was also instructed to maintain "[b]udget neutrality" year-to-year by ensuring that any increased expenditure for one payment component is offset by a decrease in another payment component so that total Medicare payments for partial hospitalization services equal what would have been paid under the pre-1997 system. *See* §§ 1395l(t)(3)(A)–(B), (t)(9)(B).

Since 2000, the Secretary has used the annual review and adjustment process to help her refine the payment system. This process includes analyzing cost data provided by both hospitals and community mental health centers. In 2000 through 2002, 2009, and 2010, the Secretary used only hospital-based cost data to compute the relative payment weights and ultimate payment rate for covered services for all partial hospitalization service providers. However, in response to comments from community mental health centers, from 2003 through 2008 the Secretary used both hospital-based and community mental health center cost data in computing relative payment weights and the ultimate payment rate for all providers.[2]

---

[1] Section 1395l(t)(9) was formerly § 1395l(t)(6). One cross-reference in the statute was not amended to conform to the renumbering of the other provisions. *See* § 1395l(t)(12)(C).

[2] The Secretary continued to use only hospital-based cost data in instances where community mental health center cost data was unavailable or of questionable validity.

No. 11-50682

B.

In July 2010, the Secretary sought comment on a proposed rule establishing the 2011 payment rate for partial hospitalization services. The proposed rule provided that the Secretary would compute separate partial hospitalization costs, relative payment weights, and ultimate payment rates for hospitals and community mental health centers based on their own respective cost data (i.e., hospital rates would reflect only their own data and community mental health center rates would reflect only their own data). The Secretary's reasoning for this change was based on "the different cost structures of [community mental health centers] and hospital-based [partial hospitalization programs]." *See* 75 Fed. Reg. 71992 (November 24, 2010) (indicating that over the years hospital costs had remained stable while community mental health center costs had declined, thereby resulting in underpayments to hospitals and overpayments to community mental health centers). During her consideration, the Secretary indicated that Congress had granted her the authority to revise the covered service groups and relative payment weights and make other adjustments by basing rates on (i) only hospital-based cost data, (ii) both hospital-based and community mental health center cost data, or (iii) only community mental health center cost data. *Id.*

Ultimately, in an attempt to prevent potential community mental health center closures caused by lower payment rates, the Secretary implemented a two-year transition into using only community mental health center cost data to calculate payment rates for community mental health centers. *Id.* at 71,993. The final rule for 2011, promulgated in November 2010, used (i) only hospital-based cost data to calculate the relative payment weights for hospital-based partial hospitalization services, and (ii) both hospital-based and community mental health center cost data to calculate the relative payment weights for community mental health center partial hospitalization services. *Id.*

No. 11-50682

C.

In December 2010, prior to implementation of the final rule and without first pursuing an administrative remedy, Paladin filed a complaint seeking injunctive relief and a declaration that the Secretary's action was unlawful. Paladin argued that the Secretary "circumvented the clear instructions of Congress regarding utilization of hospital cost data as the sole metric for developing relative payment weights for partial hospitalization services for [community mental health centers]." The Secretary moved to dismiss for lack of subject matter jurisdiction and, alternatively, for failure to exhaust administrative remedies. After a hearing, the district court dismissed the complaint for lack of subject matter jurisdiction, explaining that "sections 1395l(t)(12)(A) and (C) expressly preclude review of the relative payment-weight determination, and . . . the Secretary has acted within her statutory authority to establish payment rates for [outpatient department] services pursuant to section 1395l(t)(2)(C)."

Paladin timely appealed.

II.

Paladin raises several issues on appeal. The first is whether, pursuant to § 1395l(t)(12), Congress precluded from judicial review Paladin's challenge to the Secretary's 2011 payment rate determinations for partial hospitalization services. The second is, assuming Congress did not preclude judicial review, whether Paladin must exhaust its administrative remedies prior to filing suit in district court. And the third is, assuming the district court has jurisdiction and administrative exhaustion is not required, whether the Secretary is permitted to use community mental health center cost data in establishing and adjusting the 2011 payment rates for community mental health centers. Because we affirm the district court's determination that it lacked subject matter jurisdiction, we need not reach the second and third issues.

No. 11-50682

A.

The Secretary determined that she would calculate relative payment weights for partial hospitalization services provided by community mental health centers in 2011 using both hospital-based and community mental health center cost data. *See* 75 Fed. Reg. at 71993. The district court found that Congress expressly precluded judicial review of such determinations and dismissed Paladin's complaint for lack of subject matter jurisdiction. We review the district court's determination that it lacked subject matter jurisdiction de novo. *Nat'l Athletic Trainers' Ass'n v. U.S. Dep't of Health & Human Servs.*, 455 F.3d 500, 502 (5th Cir. 2006).

B.

There is a "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986). However,

> [s]ubject to constitutional constraints, Congress can, of course, make exceptions to the historic practice whereby courts review agency action. The presumption of judicial review is, after all, a presumption, and "like all presumptions used in interpreting statutes, may be overcome by," *inter alia*, "specific language or specific legislative history that is a reliable indicator of congressional intent," or a specific congressional intent to preclude judicial review that is "'fairly discernible' in the detail of the legislative scheme."

*Id.* at 672–73 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349, 351 (1984)).

Here, the Medicare Act's legislative scheme makes clear Congress's specific intent to preclude certain payment rate determinations from judicial review:[3]

---

[3] Congress's reason for precluding judicial review is also clear. Judicial determinations forcing the Secretary to retroactively alter payment rates for various covered services—e.g., payment rates that are adjusted annually and are required to remain budget neutral—would

No. 11-50682

> There shall be no administrative or judicial review under section 1395ff of this title, 1395oo, of this title, or otherwise of—(A) the development of the classification system under [section 1395l(t)(2)], including the establishment of groups and relative payment weights for covered [outpatient department] services, of wage adjustment factors, other adjustments, and methods described in [section 1395l(t)(2)(F)]; . . . [and] (C) periodic adjustments made under [section 1395l(t)(9)].

§ 1395l(t)(12); *see Am. Soc'y of Cataract & Refractive Surgery v. Thompson*, 279 F.3d 447, 452 (7th Cir. 2002) (finding no judicial review of "relative values and relative value units" under Medicare Part B); *Painter v. Shalala*, 97 F.3d 1351, 1356 (10th Cir. 1996) (finding no judicial review of "conversion factor" under Medicare Part B). The plain text of § 1395l(t)(12) makes Congress's intent "fairly discernible" and thus overcomes the general presumption favoring judicial review. *Mich. Acad.*, 476 U.S. at 673.

Faced with clear congressional intent to preclude from judicial review the Secretary's establishment of, and annual adjustments to, relative payment weights for partial hospitalization service payments, Paladin attempts to draw a distinction between relative payment weights and the "national rate" (a non-statutory term Paladin uses apparently meaning the ultimate payment rate—the per diem rate—for covered services). This attempt fails. As the Secretary points out, every relative payment weight is simply a component part of the ultimate payment rate, and every component is itself dependent upon the Secretary's determination of the median or mean costs for that particular service pursuant to § 1395l(t)(2)(C), factoring in any other periodic adjustments made pursuant to § 1395l(t)(9). Paladin's argument that Congress permits judicial

---

likely wreak havoc on the already complex administration of Medicare Part B's outpatient prospective payment system. *See Am. Soc'y of Cataract & Refractive Surgery v. Thompson*, 279 F.3d 447, 454 (7th Cir. 2002) (noting judicial review of annual adjustments to Medicare payment fee schedules would be "disruptive," particularly with respect to the budget neutrality requirement).

No. 11-50682

review of the ultimate payment rate yet forbids judicial review of the component parts of that same rate makes no logical sense and flies in the face of the statutory text. The ultimate payment rate is simply the sum of numerous relative payment weights, as adjusted, and a court cannot review or adjust the ultimate payment rate without improperly reviewing or adjusting its component parts. *See Am. Soc'y of Cataract & Refractive Surgery*, 279 F.3d at 452 (finding no judicial review over "relative values" also means no judicial review over the component parts of those values).

Moreover, the ultimate payment rate in any given year is based upon the aggregate adjustments made to the relative payment weights by the Secretary since she established the prospective payment system in 2000 (i.e., ten years of adjustments from 2001 to 2011). Not only did Congress expressly shield from judicial review the Secretary's initial establishment of relative payment weights in 2000, it also expressly shielded from judicial review her annual adjustments made to the relative payment weights which are supposed to "take into account changes in medical practice, changes in technology, the addition of new services, new cost data, and other relevant information and factors." *See* §§ 1395l(t)(9), (t)(12)(A), (C). Straightforward application of the statutory text shows that Paladin's challenge falls within the class of activities Congress specifically precluded from judicial review.

## C.

Paladin also argues that the district court should have exercised jurisdiction pursuant to *Leedom v. Kyne*, 358 U.S. 184, 188–89 (1958), even if Congress expressly precluded the Secretary's determinations from judicial review. In *Kyne*, the Supreme Court recognized a narrow exception to a congressional bar on judicial review for claims that an agency exceeded the scope of its authority or violated a clear statutory mandate. *Id.*

No. 11-50682

Paladin's reliance on *Kyne* is misplaced. While *Kyne* does permit a district court "to conduct a cursory review of the merits of the case to determine whether the Secretary violated a clear statutory mandate," *Hanauer v. Reich*, 82 F.3d 1304, 1309 (4th Cir. 1996) (internal quotation omitted), our cursory review reveals that the Secretary was acting within her delegated authority. When the Secretary made her 2011 payment rate determinations she was acting pursuant to her authority both to (i) "establish relative payment weights for covered [outpatient department] services . . . based on median (or, at the election of the Secretary, mean) hospital costs," § 1395l(t)(2)(C), and (ii) "review not less often than annually and revise the groups, the relative payment weights, and the wage and other adjustments . . . to take into account changes in medical practice, changes in technology, the addition of new services, new cost data, and other relevant information and factors." § 1395l(t)(9)(A).

Paladin's argument is at best a dispute over the Secretary's interpretation of the "based on . . . hospital costs" language found in § 1395l(t)(2)(C), which is not the "extraordinary" situation that falls within the very limited *Kyne* exception. *Kirby Corp. v. Pena*, 109 F.3d 258, 269 (5th Cir. 1997). Where Paladin asserts that the Secretary should interpret "based on . . . hospital costs" as requiring her to use hospital-based cost data as the *sole metric* in calculating and adjusting the relative payment weights and ultimate payment rate for 2011, the Secretary has instead decided to base the relative payment weights and ultimate payment rate on *both* hospital-based and community mental health center cost data. Even if her interpretation was incorrect, the Secretary's decision can hardly be said to be "so contrary to the terms of the relevant statute that it necessitates judicial review independent of" the no-review provisions of § 1395l(t)(12). *Id.* (noting that there must be a "facial violation[]" of the relevant statute to fall within the *Kyne* exception). There is enough ambiguity inherent in the phrase "based on . . . hospital costs" that the Secretary's interpretation

No. 11-50682

deserves deference because it is at least a plausible construction of the statute. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 & n.11 (1984); *see also Sierra Club v. EPA*, 356 F.3d 296, 305–06 (D.C. Cir. 2004) (finding "based on" to be ambiguous); *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1111 (9th Cir. 2000) (finding "based on" generally refers to a "starting point"); *Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 451 (5th Cir. 1995) (noting Congress could have "insert[ed] the adverb 'solely' before 'based upon'").

## III.

For the foregoing reasons, we find that Congress expressly precluded judicial review of the Secretary's determinations and that her actions are not a facial violation of a clear statutory mandate. Accordingly, the district court's dismissal for lack of subject matter jurisdiction is AFFIRMED.