20-2115 (L)
*Yale New Haven Hosp. v. Becerra*

# United States Court of Appeals
# For the Second Circuit

August Term 2021

Argued:  September 22, 2021
Decided:  December 19, 2022

Nos. 20-2115(L), 20-2151(XAP)

YALE NEW HAVEN HOSPITAL,

*Plaintiff-Appellee-Cross-Appellant*,

*v.*

XAVIER BECERRA, SECRETARY, UNITED
STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

*Defendant-Appellant-Cross-Appellee*.[*]

Appeal from the United States District Court
for the District of Connecticut
No. 18-cv-1230, Janet C. Hall, *Judge*.

Before:       WESLEY, SULLIVAN, *Circuit Judges*, and KOELTL, *District Judge*.[†]

---

[*] Pursuant to Rule 43(c)(2) of the Federal Rules of Appellate Procedure, Secretary Becerra is automatically substituted as a Defendant-Appellant-Cross-Appellee for the former Secretary, Alex M. Azar II.  The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

[†] Judge John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

Yale New Haven Hospital ("YNHH") receives federal funds under the Medicare Act, 42 U.S.C. § 1395 *et seq.* As part of the statutory formula for determining appropriate funding, the Medicare Act directs the Secretary of Health and Human Services (the "Secretary") to "estimate[]" the "amount of uncompensated care" that each hospital will provide to indigent patients in a given federal fiscal year ("FFY"). *Id.* § 1395ww(r)(2)(C)(i). Here, YNHH contends that the Secretary failed to conduct adequate notice-and-comment rulemaking before choosing to use only YNHH's historical data – and not that of a hospital that had recently merged into YNHH – to estimate YNHH's amount of uncompensated care for FFY 2014. The Secretary moved to dismiss for lack of subject-matter jurisdiction under 42 U.S.C § 1395ww(r)(3), which prohibits "judicial review" of "[a]ny estimate of the Secretary." The district court (Hall, *J.*) denied the Secretary's motion, reasoning that section 1395ww(r)(3) applies only to *substantive* challenges to estimates, but not to *procedural* challenges like YNHH's. The district court subsequently granted summary judgment in favor of YNHH.

The Secretary now appeals, disputing (1) the district court's ruling that it had jurisdiction to consider YNHH's procedural challenge, and alternatively (2) the district court's merits ruling that the Secretary's estimate was procedurally unlawful. YNHH defends the district court's rulings on both counts, also contending that, even if its challenge were barred by section 1395ww(r)(3), we (and the district court) would have inherent jurisdiction to consider it on a theory of ultra vires agency action. Additionally, YNHH cross-appeals, disputing the district court's chosen remedy. We conclude that the plain meaning of section 1395ww(r)(3) expressly bars *any* challenge to an "estimate of the Secretary" – whether cast in substantive or procedural terms – and we reject YNHH's argument that the canons of statutory construction justify a contrary result. We also hold that the ultra-vires exception, which is available only where a statutory preclusion of review is implied rather than express, is inapplicable here.

As a result, we **REVERSE** the district court's denial of the Secretary's motion to dismiss YNHH's procedural challenge for lack of subject-matter jurisdiction; **VACATE**, for lack of subject-matter jurisdiction, the district court's grant of

2

summary judgment for YNHH on its procedural challenge; **REMAND** the case to the district court with instructions to dismiss the remainder of YNHH's action for lack of subject-matter jurisdiction; and **DISMISS AS MOOT** YNHH's cross-appeal disputing the district court's chosen remedy.

REVERSED IN PART, VACATED IN PART, AND REMANDED; CROSS-APPEAL DISMISSED AS MOOT.

> ROBERT L. ROTH, Hooper Lundy & Bookman, PC, Washington, DC (Patrick M. Noonan, Donahue, Durham & Noonan, P.C., Guilford, CT, *on the brief*), *for Plaintiff-Appellee-Cross-Appellant* Yale New Haven Hospital.
>
> LEIF OVERVOLD, Appellate Staff Attorney (Jeffrey Bossert Clark, Acting Assistant Attorney General, Brian M. Boynton, Acting Assistant Attorney General, Alisa B. Klein, Appellate Staff Attorney, *on the brief*), Civil Division, U.S. Department of Justice, Washington, DC (Robert P. Charrow, General Counsel, Daniel J. Barry, Acting General Counsel, Janice L. Hoffman, Associate General Counsel, Susan Maxson Lyons, Deputy Associate General Counsel for Litigation, Jonathan C. Brumer, Staff Attorney, U.S. Department of Health and Human Services, Washington, DC, *of counsel*), *for Defendant-Appellant-Cross-Appellee* Xavier Becerra, Secretary of the U.S. Department of Health and Human Services.

RICHARD J. SULLIVAN, *Circuit Judge*:

Yale New Haven Hospital ("YNHH," or the "Hospital") receives federal funds under the Medicare Act, 42 U.S.C. § 1395 *et seq.*, for serving uninsured

patients who cannot pay for the healthcare they receive. As part of the statutory formula for determining the appropriate funding for such care, the Medicare Act directs the Secretary of Health and Human Services ("HHS") (the "Secretary") to make certain "estimates." As relevant here, the Secretary must "estimate[]" the "amount of uncompensated care" that each hospital will provide in a given federal fiscal year ("FFY"), based on the "data" that "the Secretary determines" "appropriate" to "use" as the best "proxy for the costs of . . . hospitals for treating the uninsured." *Id.* § 1395ww(r)(2)(C)(i). The Medicare Act provides that there "shall be no . . . judicial review" of "[a]ny" such "estimate of the Secretary." *Id.* § 1395ww(r)(3)(A).

Here, YNHH challenges the Secretary's estimate of its amount of uncompensated care for FFY 2014, the first FFY following YNHH's merger with the Hospital of Saint Raphael ("St. Raphael"), a nearby hospital that had historically treated a proportionally greater share of low-income patients than YNHH. YNHH contends that the Secretary failed to abide by adequate notice-and-comment rulemaking procedures before choosing to use only YNHH's historical data – and not St. Raphael's – to estimate YNHH's amount of uncompensated care for FFY 2014. The Secretary moved to dismiss this claim for

4

lack of subject-matter jurisdiction, arguing that it was barred by section 1395ww(r)(3)'s prohibition on judicial review of the "estimate[s] of the Secretary." *Id.* The district court (Hall, *J.*) denied the Secretary's motion, reasoning that section 1395ww(r)(3) applies only to *substantive* challenges to the Secretary's estimates, whereas YNHH's challenge was *procedural*. The district court subsequently granted summary judgment in favor of YNHH, finding that the Secretary had indeed failed to conduct adequate notice-and-comment rulemaking before choosing to exclude the St. Raphael data, and remanded to the Secretary without vacating his calculation of YNHH's 2014 payment.

The Secretary now appeals, disputing (1) the district court's ruling that it had jurisdiction, notwithstanding section 1395ww(r)(3), to consider YNHH's procedural challenge; and alternatively (2) the district court's merits ruling that the Secretary's exclusion of the St. Raphael data was procedurally unlawful. YNHH defends the district court's rulings on both counts, also contending that, even if its challenge were barred by section 1395ww(r)(3), we (and the district court) would nevertheless have inherent subject-matter jurisdiction under *Leedom v. Kyne*, 358 U.S. 184 (1958), to consider it on a theory of ultra vires agency action. Additionally, YNHH cross-appeals, disputing the district court's chosen remedy

5

of remand without vacatur.  We conclude that the plain and ordinary meaning of section 1395ww(r)(3)'s text bars *any* challenge to an "estimate of the Secretary" – whether cast in substantive or procedural terms – and we reject YNHH's arguments that either the canon of meaningful variation or the substantive canon favoring judicial review of executive action justifies departing from the plain meaning of the text.  We therefore hold that section 1395ww(r)(3) expressly deprives us – and the district court – of subject-matter jurisdiction to consider YNHH's challenge.  We also hold that *Kyne*'s ultra-vires exception, which is available only where the pertinent statutory preclusion of review is implied rather than express, is inapplicable here.

As a result, we **REVERSE** the district court's denial of the Secretary's motion to dismiss YNHH's procedural challenge for lack of subject-matter jurisdiction; **VACATE**, for lack of subject-matter jurisdiction, the district court's grant of summary judgment for YNHH on its procedural challenge; **REMAND** the case to the district court with instructions to dismiss the remainder of YNHH's action for lack of subject-matter jurisdiction; and **DISMISS AS MOOT** YNHH's cross-appeal disputing the district court's chosen remedy of remand without vacatur.

## I. Background

Under the Medicare Act, 42 U.S.C. § 1395 *et seq.* – enacted by Congress in 1965 as Title XVIII of the Social Security Act, and administered by the Secretary, *see id.* § 1395kk(a) – the federal government pays for healthcare for elderly and disabled individuals. Under Medicare's Inpatient Prospective Payment System, the Secretary reimburses participating hospitals for the operating costs of providing inpatient hospital services to Medicare beneficiaries. *See id.* § 1395ww(d). Hospitals that serve "a significantly disproportionate number of low-income patients," *id.* § 1395ww(d)(5)(F)(i)(I), are deemed "disproportionate share hospital[s]" ("DSHs") and receive an increased payment, *id.* § 1395ww(r), in recognition of the relatively higher costs associated with providing such care.

Prior to FFY 2014, the Secretary had calculated hospitals' DSH payments under a statutory formula (the "Traditional DSH Formula"), *id.* § 1395ww(d)(5)(F)(vi)–(vii), "that consider[ed] their Medicare utilization due to beneficiaries who also receive[d] Supplemental Security Income benefits and their Medicaid utilization," Medicare Program 2014 Final Rule, 78 Fed. Reg. 50,496, 50,505 (Aug. 19, 2013). The Traditional DSH Formula, however, did not account for the cost to hospitals of providing "uncompensated care," i.e., care for patients

7

who have *no* means to pay (whether through federally furnished insurance programs or otherwise). *See id.* at 50,622, 50,634–35.

The Patient Protection and Affordable Care Act of 2010 (the "ACA") implemented a new formula for calculating DSH payments from FFY 2014 onward (the "Adjusted DSH Formula"), 42 U.S.C. § 1395ww(r), which places greater emphasis on the cost to hospitals of providing uncompensated care. Under the Adjusted DSH Formula, each hospital receives 25% of the amount it would have received under the Traditional DSH Formula, *id.* § 1395ww(r)(1), as well as an "[a]dditional payment" (the "UC DSH Payment") calculated by multiplying three statutorily defined "factors," each based on various data points "as estimated by the Secretary," *id.* § 1395ww(r)(2). At issue in this case is "Factor [T]hree," which measures an individual hospital's share of all uncompensated care nationwide. *Id.* § 1395ww(r)(2)(C). Factor Three is calculated by taking the quotient of the following ratio:

> (i) the amount of uncompensated care for such hospital for a period selected by the Secretary (as estimated by the Secretary, based on appropriate data (including, in the case where the Secretary determines that alternative data is available which is a better proxy for the costs of [DSHs] for treating the uninsured, the use of such alternative data)) . . .
>
> _____
>
> (ii) the aggregate amount of uncompensated care for all [DSHs] that

receive a payment under this subsection for such period (as so estimated, based on such data).

*Id.* The ACA's amendments to the Medicare Act provide that "[t]here shall be no administrative or judicial review under section 1395ff of this title, section 1395*oo* of this title, or otherwise of . . . [a]ny estimate of the Secretary for purposes of determining the [three] factors [that make up the UC DSH Payment formula]." *Id.* § 1395ww(r)(3)(A).

In September 2012, St. Raphael merged into YNHH and became a campus of YNHH. After the merger was complete, YNHH continued to operate the former St. Raphael facilities as a second inpatient acute care hospital campus with all services, including its provision of uncompensated care, being provided under YNHH's name and certification number (as used in HHS databases for tracking services provided by Medicare- and Medicaid-participating hospitals).

About nine months after that merger, HHS announced a proposed rule to implement the Adjusted DSH Formula, specifying the "data sources and methodologies [to be used] for computing" the three UC DSH Payment factors for FFY 2014. Medicare Program 2014 Proposed Rule, 78 Fed. Reg. 27,486, 27,582 (May 10, 2013). The 2014 Proposed Rule stated that Factor Three would be calculated as the ratio of the aggregate number of days of inpatient care provided

to Medicaid and Medicare-SSI patients at each DSH, divided by the total number of such days for all DSHs nationally, using recent historical cost-report data from HHS's own databases. *See id.* at 27,588–90. The 2014 Proposed Rule did not specify whether, for newly merged hospitals, HHS would calculate Medicare payments using combined data from both hospitals or only the data previously provided by the acquiring hospital.

In its 2014 Final Rule, HHS finalized the methodology and data selection it had previously announced. *See* Medicare Program 2014 Final Rule, 78 Fed. Reg. at 50,634–43. The 2014 Final Rule also explained that "in the case of a merger between two hospitals, Factor [Three] will be calculated based on the [data] under the surviving [hospital's HHS certification number]" and exclude "[d]ata associated with a[n HHS certification number] that is no longer in use" (i.e., data from the subsumed hospital). *Id.* at 50,642. Consistent with this explanation, Factor Three of YNHH's 2014 UC DSH Payment calculation was estimated using YNHH's historical share of uncompensated care, but not St. Raphael's.

YNHH filed an appeal with the Provider Reimbursement Review Board (the "PRRB"), which denied relief on the ground that section 1395ww(r)(3) barred administrative review. The Administrator of the Centers for Medicare & Medicaid

10

Services then declined to review the PRRB's decision, making it the Secretary's "final" decision for purposes of "judicial review." 42 U.S.C. § 1395*oo*(f)(1).

YNHH then filed this action in district court, arguing that the Secretary's calculation of the Hospital's 2014 UC DSH Payment should be set aside on both substantive and procedural grounds. Based on section 1395ww(r)(3), the district court dismissed all of YNHH's claims except its procedural challenge, which asserted that its 2014 UC DSH Payment had been calculated using a "procedurally unlawful" policy – i.e., the choice to exclude the St. Raphael data, as announced in the preamble of the 2014 Final Rule – adopted in violation of the notice-and-comment rulemaking requirements of the Administrative Procedure Act (the "APA"), *see* 5 U.S.C. § 553, and the Medicare Act, *see* 42 U.S.C. § 1395hh. Specifically, the district court reasoned that section 1395ww(r)(3) barred review of the Secretary's estimates of factors within his UC DSH Payment calculation but did *not* bar "review of the *promulgation* of the Secretary's rules and policies, separate from the *substance* of any such rules or policies or the determination of its estimates based on the substance of those rules or policies." J. App'x at 51 (emphasis in original).

11

YNHH and the Secretary subsequently cross-moved for summary judgment on YNHH's remaining procedural challenge. The district court ruled for YNHH on the merits, finding that the 2014 Proposed Rule's "oblique reference to an 'individual hospital' and 'its most recent data'" had not fairly apprised YNHH of the so-called "Merged Hospital Policy" (i.e., the choice to exclude the St. Raphael data), which "departed from [HHS's past] practice of using combined data from merged hospitals" when calculating wage and payment report data for newly merged hospital entities. *Id.* at 96–97 (alteration omitted); *see also* YNHH Br. at 8 (defining "Merged Hospital Policy"). The court also recognized, however, that the "Factor Three calculations" at issue in the 2014 Final Rule "were finalized more than six years ago, and [that] setting them aside would result in significant disruption." J. App'x at 106. Thus, although YNHH had not requested such a remedy, the court sua sponte determined that "the appropriate remedy is to remand this case to the Secretary without vacatur," so the Secretary could take "further action consistent with" the district court's opinion. *Id.* at 107–08. The court further noted that its ruling would permit HHS to "use proper rulemaking process to readopt the same policy and arrive at the same Factor Three calculations." *Id.* at 89 n.6.

12

The parties now cross-appeal from the district court's judgment. The Secretary disputes (1) the district court's ruling that it had jurisdiction, notwithstanding section 1395ww(r)(3), to consider YNHH's challenge; and alternatively (2) its merits ruling that the Secretary's exclusion of the St. Raphael's data was procedurally unlawful. For its part, YNHH (1) takes issue with the relief granted by the court and seeks vacatur of the so-called "2014 Merged Hospital Policy," and (2) reasserts its claim that even if its procedural challenge were barred by section 1395ww(r)(3), inherent subject-matter jurisdiction would still lie on a theory of ultra vires agency action.

## II.    Standard of Review

We review a district court's determination of subject-matter jurisdiction de novo. *See Tilton v. SEC*, 824 F.3d 276, 281 (2d Cir. 2016). "The plaintiff[] bear[s] the burden of establishing jurisdiction," including in cases where – as here – we are called upon to "interpret[] a provision that precludes judicial review." *Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).[1] In interpreting such a provision, "we 'must determine

---

[1] We reject YNHH's contention that "[w]here the jurisdictional question turns on a statutory provision that allegedly precludes otherwise valid judicial review . . . , the burdens shift and 'the party seeking to read a legislative scheme to preclude review bears the burden of demonstrating Congress'[s] intent to do so.'" YNHH Br. at 35 (quoting *UHS of McAllen, Inc. v. Sullivan*, 770 F.

whether the challenged agency action is of the sort shielded from review' and 'may not inquire whether a challenged agency decision is arbitrary, capricious, or procedurally defective' unless we are certain of our subject[-]matter jurisdiction." *Id.* (quoting *Amgen, Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004)).

While courts have "long recognized a strong presumption in favor of judicial review of final agency action," *Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896, 1902 (2022) (internal quotation marks omitted), "[t]he presumption of judicial review . . . may be overcome by, inter alia, specific language or specific legislative history that is a reliable indicator of congressional intent, or a specific congressional intent to preclude judicial review that is fairly discernible in the

---

Supp. 704, 710 (D.D.C. 1991)) (alteration omitted). The district-court decision that YNHH invokes for that proposition is no longer good law even in its own circuit. *Compare Bartlett v. Bowen*, 816 F.2d 695, 699 (D.C. Cir. 1987) ("[T]he party seeking to read a legislative scheme to preclude review bears the burden of demonstrating Congress'[s] intent to do so."), *with Knapp Med. Ctr.*, 875 F.3d at 1128 (holding, in 2017, that even when a court is "interpreting a provision that precludes judicial review," it is still "[t]he plaintiff[]" who "bear[s] the burden of establishing jurisdiction" (citing *Lujan*, 504 U.S. at 561)). And while we are not bound by *Knapp*'s apparent abrogation of *Bartlett* (or by *Bartlett* itself), *see Rates Tech. Inc. v. Speakeasy, Inc.*, 685 F.3d 163, 173–74 (2d Cir. 2012), our independent judgment is that the *Knapp* rule is correct. For starters, the *Knapp* rule better accords with the "venerable" and "long-standing" line of binding Supreme Court precedent "confirming the rule that the party invoking jurisdiction bears the burden." *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 58 (2d Cir. 2006) (citing *Turner v. Enrille*, 4 U.S. (4 Dall.) 7 (1799); *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182–83 (1936)). It is also more consistent with the principle, as discussed in greater detail below, that substantive canons (like the presumption favoring review of executive actions) generally factor in at the *end* of our interpretative process, not at the threshold. *See infra* Section III.A.2.b.ii. We therefore adopt the *Knapp* rule as our own.

detail of the legislative scheme," *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 673 (1986) (internal quotation marks omitted).  Thus, "[w]hether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984).

### III.    Discussion

#### A.    Statutory Jurisdiction

The Medicare Act strips federal courts of jurisdiction to perform "judicial review . . . of . . . [a]ny estimate of the Secretary for purposes of determining the [three] factors," 42 U.S.C. § 1395ww(r)(3)(A), that are multiplied together to calculate qualifying hospitals' UC DSH Payments for each federal fiscal year, *see id.* § 1395ww(r)(2).  One such "estimate" is the "estimate[] by the Secretary" of "the amount of uncompensated care for [each qualifying] hospital for a period selected by the Secretary . . . , based on appropriate data (including, in the case where the Secretary determines that alternative data is available which is a better proxy for the costs of [qualifying] hospitals for treating the uninsured, the use of such alternative data)." *Id.* § 1395ww(r)(2)(C)(i).

15

Here, the ultimate object of YNHH's challenge is – and has been since the beginning of this litigation – the Secretary's "estimate[]" of YNHH's "amount of uncompensated care" for FFY 2014, *id.*, insofar as that estimate "excluded . . . the data" on care provided to uninsured patients at St. Raphael, which "had merged into [YNHH] . . . before the beginning of FFY 2014," J. App'x at 8. YNHH's original complaint, which included six separate claims, alleged that "the exclusion of this data was . . . unlawful" for a variety of reasons that it variously characterized as "substantive[]" or "procedural[]." *Id.* at 9. But in the sole remaining claim pressed on appeal, YNHH argued only that "the exclusion of [the St. Raphael] data was . . . procedurally unlawful" because the "policy undergirding the exclusion of [such] data" for newly merged hospitals (1) "departed from longstanding [HHS] policy" concerning such hospitals, and (2) did so without "provid[ing] notice about the possible imposition of this new policy or an opportunity to comment, as required by the APA and the Medicare Act." *Id.* Therefore, we must decide whether our reaching the merits of YNHH's challenge would constitute "judicial review" of an "estimate of the Secretary," which is barred under 42 U.S.C. § 1395ww(r)(3)(A).

16

### 1. Clarifying YNHH's Challenge

YNHH suggests – and the district court agreed – that the "review" it seeks is several analytical steps removed from the "estimate" that the statute explicitly shields from "judicial review." 42 U.S.C. § 1395ww(r)(3)(A). Quoting the district court's decision, YNHH asserts that its only remaining claim "does not challenge the Secretary's estimate of the Hospital's DSH payment, any of the underlying data, or the Secretary's choice of such data. Instead, it is a challenge to the [rulemaking] procedure by which the Secretary established the FFY 2014 Merged Hospital Policy." YNHH Br. at 38 (quoting J. App'x at 49) (alterations omitted). But this mischaracterizes both the statute and the nature of YNHH's own challenge.

While YNHH implies that the review-preclusion provision applies only to the Secretary's *bottom-line* estimates of each qualifying hospital's "DSH [P]ayment," *id.* – rather than the Secretary's "estimate[]" of the "amount of uncompensated care," 42 U.S.C. § 1395ww(r)(2)(C)(i), which the Hospital characterizes as mere "underlying data," YNHH Br. at 38 (quoting J. App'x at 49) – the statute makes clear that the "estimate[s]" it immunizes are the Secretary's "estimate[s] . . . for purposes of *determining the factors*" that are multiplied together to compute the UC DSH Payment, 42 U.S.C. § 1395ww(r)(3)(A) (emphasis added).

17

Thus, the Secretary's estimate of YNHH's amount of uncompensated care for FFY 2014 is not just "underlying data" for the relevant "estimate" – it *is* the "estimate." *Contra* YNHH Br. at 38 (quoting J. App'x at 49).

Relatedly, YNHH's contention that "the Secretary's choice of . . . data" is a distinct precursor to, rather than a *part of*, the "estimate" in question, *id.*, overlooks the statutory definition of the "estimate" at issue here. According to that definition, "the amount of uncompensated care for [YNHH] for [FFY 2014] []as estimated by the Secretary" explicitly encompasses the Secretary's selection of "appropriate data," "the Secretary['s] determin[ation] that alternative data is available which is a better proxy for the costs of [qualifying] hospitals for treating the uninsured," and the Secretary's choice of whether or not to "use . . . such alternative data." 42 U.S.C. § 1395ww(r)(2)(C)(i). Thus, we join the D.C. Circuit in "reject[ing] the argument that 'an "estimate" is not the same thing as the "data" on which it is based.'" *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 506–07 (D.C. Cir. 2019) (quoting *Fla. Health Scis. Ctr., Inc. v. Sec'y of HHS*, 830 F.3d 515, 519 (D.C. Cir. 2016)). We also adopt the D.C. Circuit's holding that "[i]n this statutory scheme, a challenge to the [Secretary's choice of what data to include and exclude] for estimating uncompensated care is . . . a challenge to the estimates themselves. The

18

statute draws no distinction between the two." *Id.* at 506. Indeed, the statutory text of section 1395ww(r)(2)(C)(i) explicitly and affirmatively defines the statutory term "estimate[]" to encompass "the Secretary['s] determin[ation]" of what data is the "be[st] proxy for the costs of [qualifying] hospitals for treating the uninsured" and, ultimately, of what data to "use" or not "use." 42 U.S.C. § 1395ww(r)(2)(C)(i).

Similarly confusing is YNHH's repeated invocation of the so-called "2014 Merged Hospital Policy" throughout its brief. YNHH Br. at 38 (quoting J. App'x at 49). As it turns out, the "Merged Hospital Policy" is a term of YNHH's own invention, which it has defined simply to mean "the Secretary['s] . . . exclu[sion] from the calculation of the UC DSH [P]ayment for 2014 for [YNHH] (and a handful of other hospitals) the uncompensated[-]care data from another . . . eligible hospital that had merged into [YNHH] before the beginning of 2014." *Id.* at 8 (defining "Merged Hospital Policy"). In other words, the "Merged Hospital Policy" amounts to nothing more than the Secretary's choice to "exclude[]" (i.e., to *not use*) "the uncompensated[-]care data from [St. Raphael]." *Id.* And again, the statute defines the Secretary's "determin[ation]" of the most "appropriate data" to "use" (or not to "use") as a "proxy for the costs of [qualifying] hospitals for treating the uninsured," 42 U.S.C. § 1395ww(r)(2)(C)(i), as a constitutive part of one of the

19

"estimate[s] of the Secretary" that is explicitly shielded from "judicial review," *id.* § 1395ww(r)(3)(A).  At bottom, then, what YNHH calls "the FFY 2014 Merged Hospital Policy," YNHH Br. at 38 (quoting J. App'x at 49), is really just *the estimate of the Secretary* as contemplated by the statute.

## 2. Interpreting the Statute

Having cleared up YNHH's attempts to recast the nature of its challenge, we still are left with an honest (and evidently novel) question of statutory interpretation:  where the Medicare Act precludes "judicial review" of "[a]ny estimate of the Secretary," does its bar extend to a claim that such an "estimate" was the product of a defective notice-and-comment rulemaking process? 42 U.S.C. § 1395ww(r)(3)(A).

YNHH's argument focuses on a nearly metaphysical "separat[ion]" between "the 'estimate'" and the "promulgation" of policies "that result[] in the 'estimate.'"  YNHH Br. at 42 (quoting J. App'x at 51).  Based on that putative separation, the Hospital contends that if "Congress [had] intended to preclude . . . otherwise valid request[s] for . . . judicial review of the Secretary's failure to use proper rulemaking procedures" when generating "estimates," then section 1395ww(r)(3) would say so "explicitly."  *Id*. at 36, 44.  YNHH therefore argues that we may review its claim without violating the command of

20

section 1395ww(r)(3)(A), since it is "challeng[ing] the Secretary's rulemaking failures, not the 'estimates of the Secretary.'" *Id.* at 45 (quoting J. App'x at 28). The Secretary's argument, by contrast, is more straightforward: the plain text of the statute "bars judicial review of the estimates made by the Secretary for purposes of determining uncompensated[-]care payments to hospitals," without making distinctions or carveouts based on "whether the challenge to such an estimate is cast in substantive or procedural terms." Secretary Br. at 17 (capitalization standardized). We agree with the Secretary.

### a. Plain Meaning

"[T]o determine whether the language at issue has a plain and unambiguous meaning," *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 512 (2d Cir. 2017) (citation omitted), "[w]e begin, as we must, with the text of the statute," *Lawrence + Mem'l Hosp. v. Burwell*, 812 F.3d 257, 259 (2d Cir. 2016). The text of section 1395ww(r)(3) provides that "[t]here shall be no . . . judicial review . . . of . . . [a]ny estimate of the Secretary." 42 U.S.C. § 1395ww(r)(3)(A). To conduct "judicial review" means to exercise our "power to review the actions of other branches of government," and in particular, our "power to *invalidate . . .* executive actions." *Judicial Review*, Black's Law Dictionary 1013 (11th ed. 2019) (emphasis added); *see Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health &*

21

*Hum. Res.*, 532 U.S. 598, 603 (2001) (treating Black's Law Dictionary as authoritative when giving effect to "legal term[s] of art"); *see also Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 566, 572–73, 581 (2007) (equating "judicial review of [agency] regulations" with court's "determination" of whether "the regulation . . . is *invalid*" (emphasis added)); *Yakus v. United States*, 321 U.S. 414, 418 (1944) (equating "judicial review of regulations" with "determining the[ir] *validity*" (emphasis added)); *United States ex rel. Daniman v. Shaughnessy*, 210 F.2d 564, 565 (2d Cir. 1954) (explaining that "judicial review" of an agency order "is had" when judicial proceedings "[]question[] the *validity* of such an order" (emphasis added)). Here, then, what section 1395ww(r)(3) precludes is our passing on the *validity* of the Secretary's estimate – i.e., our considering the merits of any argument that such an estimate is *invalid*.

An alleged procedural problem with the estimate, just like an alleged substantive problem with the estimate, is simply a putative reason *why* the estimate might be invalid. Indeed, YNHH's complaint seems to concede as much, as it invoked the estimate's alleged "procedural[]" deficiency relative to the APA and Medicare Act's notice-and-comment requirements right alongside its alleged "substantive[]" deficiency relative to the "purpose of the UC DSH [P]ayment."

J. App'x at 9 ¶¶ 2–3. In essence, these alleged deficiencies are offered as parallel "reasons" why the Secretary's "exclusion of [the St. Raphael] data was . . . unlawful." *Id.* Thus, whether we were to consider YNHH's substantive challenge or its procedural challenge to the Secretary's 2014 estimates, we would still be performing "judicial review" of the "estimate[s] of the Secretary." 42 U.S.C. § 1395ww(r)(3)(A). We are therefore persuaded by our sister circuit's reasoning that "[i]f a no-review provision shields particular types of administrative action, a court may not inquire whether a challenged agency decision is arbitrary, capricious, *or procedurally defective*"; rather, a court "must" simply "determine whether the challenged agency action is of the sort shielded from review." *Amgen*, 357 F.3d at 113 (emphasis added).

Accordingly, YNHH cannot carry its "burden of establishing jurisdiction," *Knapp Med. Ctr.*, 875 F.3d at 1128, simply by casting its challenge as one to "the promulgation of the Secretary's . . . policies" that "result[ed] in the 'estimate,'" YNHH Br. at 42 (quoting J. App'x at 51). Rather, YNHH must explain how we could possibly entertain such a challenge "without reviewing the estimate itself." *DCH Reg'l Med. Ctr.*, 925 F.3d at 506. That it has plainly failed to do. To the contrary, YNHH's own prayer for relief in its complaint makes clear that the

23

Hospital "is simply trying to undo the Secretary's estimate of its uncompensated care by recasting its challenge to that estimate as an attack on the underlying [rulemaking procedures]." *Id.* at 508. That is made "explicit[]" by the fact that YNHH is "seeking vacatur of the calculation of its own DSH additional payment for fiscal year 2014 and an order requiring the Secretary to recalculate it." *Id.*; *see* J. App'x at 31 ("[T]he Hospital requests . . . [a]n order instructing the Secretary to recalculate the Hospital's FFY 2014 UC DSH [P]ayment after including the [St. Raphael] data[] and pay the Hospital the additional amount due . . . .").[2]

### b. Canons of Statutory Construction

Unable to rely on the plain language of section 1395ww(r)(3)(A), YNHH falls back on canons of statutory construction that, it contends, compel us to adopt its preferred reading of the statute. The first of these arguments is based on the "meaningful-variation canon," i.e., the principle that "[w]here a [statutory scheme] has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea." *Sw. Airlines*

---

[2] YNHH tries to preempt this point by urging that its complaint *also* sought "an order invalidating the FFY 2014 Merged Hospital Policy." YNHH Br. at 45 (quoting J. App'x at 31) (alteration omitted). But as we have already explained, what YNHH calls the "Merged Hospital Policy" is nothing more than a dressed-up way of referring to the Secretary's selection of "appropriate data" that is, by statutory definition, a constituent part of the Secretary's "estimate[]" of hospitals' "amount of uncompensated care." 42 U.S.C. § 1395ww(r)(2)(C)(i).

*Co. v. Saxon*, 142 S. Ct. 1783, 1789 (2022) (citation and alteration omitted). Using this canon, the Hospital essentially argues that if Congress had wanted to bar judicial review not only of the substance of the Secretary's "estimate[s]," but also of the administrative rulemaking processes that yielded such "estimate[s]," 42 U.S.C. § 1395ww(r)(3)(A), Congress "knew how to do so," *Custis v. United States*, 511 U.S. 485, 492 (1994) – namely, by including specific and explicit reference to "the establishment of such estimates," as found in other sections of the Medicare Act. YNHH's second argument invokes the substantive "reviewability canon," which carries the "strong presumption" that "[j]udicial review of final agency action in an otherwise justiciable case is traditionally available unless a statute's language or structure precludes judicial review." *Am. Hosp. Ass'n*, 142 S. Ct. at 1902 (internal quotation marks omitted). Neither of these arguments is persuasive.

### i. The Canon of Meaningful Variation

As summarized above, YNHH argues that if "Congress [had] intended to preclude . . . otherwise valid request[s] for . . . judicial review of the Secretary's failure to use proper rulemaking procedures" when generating "estimates," then Congress could and should have said so "explicitly." YNHH Br. at 36, 44. In support of this contention, YNHH points us to another review-preclusion

25

provision within the Medicare Act that bars "judicial review . . . of the process [whereby the Secretary may exempt physician-owned hospitals in medically underserved areas from otherwise-applicable restrictions on their ability to expand] *(including the establishment of such process)*."   42 U.S.C. § 1395nn(i)(3)(I) (emphasis added); *see generally id.* § 1395nn(i)(3) (laying out the covered "process").  But "the mere possibility of clearer phrasing cannot defeat the most natural reading of a statute; if it could (with all due respect to Congress), we would interpret a great many statutes differently than we do."  *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 416 (2012); *accord Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 317 (S.D.N.Y. 2012) (same), *aff'd,* 712 F.3d 136 (2d Cir. 2013); *Animal Legal Def. Fund v. USDA*, 935 F.3d 858, 871 (9th Cir. 2019) (same); *Elec. Priv. Info. Ctr. v. DHS*, 777 F.3d 518, 525 (D.C. Cir. 2015) (same); *see also, e.g., Hammer v. HHS*, 905 F.3d 517, 528 (7th Cir. 2018) ("[W]e cannot ignore the plain meaning of the statute because Congress could have, arguably, made the statute's meaning even plainer."); *Castaneda v. Souza*, 810 F.3d 15, 48 (1st Cir. 2015) ("Of course, the fact that language might have been more clear – as it always could be – does not mean that it is not clear enough.").

Moreover, we reject the underlying premise of YNHH's meaningful-variation argument: that the words "*including the establishment of*" are the "magic words" that Congress "incant[s]" in any review-preclusion provision that it intends to bar procedural as well as substantive challenges to a given type of agency action. *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013); *see also Donnelly v. Controlled Application Rev. & Resol. Program Unit*, 37 F.4th 44, 54 (2d Cir. 2022). We are aware of nothing to suggest that the phrase "including the establishment of" (or simply "the establishment of"), as used in various review-preclusion provisions throughout the Medicare Act, has anything at all to do with the distinction between substantive and procedural challenges.

For its meaningful-variation argument, YNHH relies on the D.C. Circuit's decision in *Knapp Medical Center v. Hargan*. There, a hospital argued that "'[the] process,' as used in section 1395nn(i)(3)(I), refers only to the [substance of the] HHS regulation [at issue], and 'the establishment of the process' [refers to] the notice-and-comment rulemaking by which th[at] regulation was developed and promulgated." *Knapp Med. Ctr.*, 875 F.3d at 1129. What YNHH neglects to mention, however, is that the D.C. Circuit squarely "reject[ed]" that "contention[]." *Id.* at 1130.

27

Other decisions by our sister circuits cast further doubt on YNHH's proposed reading of the phrase, "the establishment of." In *Amgen*, as in *Knapp*, the D.C. Circuit was tasked with interpreting a review-preclusion provision in the Medicare Act that included the "establishment of" language relied on by YNHH here. *See Amgen*, 357 F.3d at 111 (applying 42 U.S.C. § 1395*l*(t)(12)(A), which provides that "[t]here shall be no . . . judicial review . . . of . . . [t]he development of the [prospective payment] classification system under paragraph (2), including *the establishment of* groups and relative payment weights for covered [outpatient department] services" (emphasis added)). As we noted above, *Amgen* held that, once it has determined that the provision at issue "shields [a] particular type[] of administrative action, a court may not inquire whether a challenged agency [action of that type] is arbitrary, capricious, *or procedurally defective*." *Id.* at 113 (emphasis added). Tellingly, the D.C. Circuit did not rely on the presence of the "establishment of" language for that proposition. That is, instead of limiting its holding to "no-review provision[s] [that] shield[] ['the establishment of'] particular types of administrative action," the D.C. Circuit announced a much broader holding: "[i]f *a no-review provision*" – *any* no-review provision – "shields particular types of administrative action, a court may not inquire whether a

28

challenged agency decision is arbitrary, capricious, or procedurally defective, but [instead] must [simply] determine whether the challenged agency action is of the sort shielded from review." *Id.* (emphasis added). For present purposes, then, *Amgen* stands for the proposition that Congress need not formulaically recite the "establishment of" language in order to shield a "particular type[]" of "agency decision" from "procedural[]" as well as substantive "challenge[s]"; rather, it is sufficient for Congress simply to express in "clear and convincing" language its "inten[t] to preclude judicial review" of that "*type[] of administrative action.*" *Id.* at 112–13 (emphasis added).

To be clear, *Amgen* matters not because we are bound by the reasoning of our sister circuits – we are not. *See, e.g.*, *Rates Tech.*, 685 F.3d at 173–74. Rather, the D.C. Circuit's 2004 decision in *Amgen* is relevant because it formed part of the backdrop against which Congress drafted and enacted section 1395ww(r)(3) in 2010. *See* Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, § 3133(2), 124 Stat. 119, 433 (codified at 42 U.S.C. § 1395ww(r)(3)). "We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent." *Tanvir v. Tanzin*, 894 F.3d 449, 463 (2d Cir. 2018) (quoting *Ryan v. Gonzales*, 568 U.S. 57, 66, (2013)); *see also, e.g.*, *Mobil Cerro Negro, Ltd. v. Bolivarian*

29

*Republic of Venezuela*, 863 F.3d 96, 115 (2d Cir. 2017) ("Congress is presumed to legislate with familiarity of the legal backdrop for its legislation."). And in turn, we may presume "that Congress was adopting, rather than departing from," *Amgen*'s "established assumptions about how [review-preclusion provisions in the Medicare Act] work[]." *Nat. Res. Def. Council, Inc. v. FDA*, 760 F.3d 151, 166 (2d Cir. 2014); *see also Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 537 (2015) (explaining that where "Courts of Appeals ha[ve] reached a consensus interpretation" of given statutory language and "Congress . . . amend[s] the [statute] without changing the relevant provision," that "is persuasive [proof] that the construction adopted by the lower federal courts has been acceptable to the legislative arm of the government" (citation and alterations omitted)).

And while it is true that the "establishment of" language does appear in some of the other review-preclusion provisions that the ACA inserted into the Medicare Act, *see, e.g.*, 42 U.S.C. §§ 1395ww(o)(11)(B)(iii), 1395w-4(n)(9)(G), (p)(10)(A)–(C), there is a far more plausible explanation for the appearance of such language there. Specifically, the ACA inserted into the Medicare Act ten new review-preclusion provisions with language similar to that used in

section 1395ww(r)(3).  *See Knapp Med. Ctr.*, 875 F.3d at 1128 n.1 (collecting ACA-enacted provisions that include the language, "There shall be no administrative or judicial review under section 1395ff of this title, section 1395*oo* of this title, or otherwise of [specified agency actions]").  Collectively, they preclude judicial review of dozens of types of agency actions and decisions that are mandated or authorized in other specified provisions of the Medicare Act.  In some of those underlying substantive provisions, the statutory language provides that "the Secretary shall establish" something – a set of "performance standards," a "performance period," a "methodolog[y]," a "payment modifier," a "measure[] of the quality of care," or a "measure[] of costs."   42 U.S.C. §§ 1395jjj(b)(3)(C), 1395ww(o)(4), 1395w-4(n)(9)(C), (p)(1), (p)(2)(B)(i), (p)(3).  For *every single one* of these underlying substantive provisions, the corresponding review-preclusion provision uses the language, "There shall be no . . . judicial review . . . of . . . *the establishment of* [the specified agency action or decision]."   *Id.* §§ 1395jjj(g)(2), 1395ww(o)(11)(B)(iii), 1395w-4(n)(9)(G), (p)(10)(A)–(C), (emphasis added; some capitalization standardized).

In *other* substantive provisions that authorize or mandate agency actions subject to ACA-enacted review-preclusion provisions, however, the statutory

31

language uses verbs *other than* "establish" to characterize the agency action at issue. These provisions direct the Secretary, for example, to "develop a methodology," "determine[] appropriate" "condition[s]," "identif[y]" and "seek the endorsement" of "a consensus organization," or "terminate or modify the design and implementation of a model." *Id.* §§ 1395ww(o)(5)(A), (p)(3), (q)(5)(B), 1315a(b)(3)(B); *see also, e.g., id.* § 1395w-4(p)(4)(B)(ii) ("Secretary shall specify"), 1395*l*(x)(2)(B) (Secretary shall "identif[y]"), 1395jjj(d)(4) ("Secretary may terminate"). In *none* of the review-preclusion provisions corresponding to the agency actions specified in *these* substantive provisions does the "establishment of" language appear. *See id.* §§ 1315a(d)(2), 1395*l*(x)(4), 1395w-4(p)(10)(D)–(G), 1395ww(o)(11)(B)(i)–(ii), (iv)–(vi), 1395ww(p)(7), (q)(7), 1395jjj(g)(1), (3)–(4), (6).

Based on our survey of the review-preclusion provisions inserted into the Medicare Act by the ACA, we are confident that Congress's use of the phrase "*the establishment of*" does not signify an intent to preclude procedural challenges to a specified agency action. Rather, it simply – and unremarkably – reflects a preference for linguistic parallelism whereby Congress copied and pasted the term "establish" from certain substantive provisions into their corresponding review-preclusion provisions. And if the *inclusion* of the phrase "the establishment of"

32

has nothing to do with congressional intent to *preclude* procedural challenges to pertinent agency actions, then it follows that the *omission* of that phrase surely does not signify congressional intent to *allow* procedural challenges.

### ii. The Reviewability Canon

YNHH alternatively relies on the canon of construction known as the "reviewability canon," which embodies the traditional presumption favoring judicial review of agency action. That is, "[w]hen a statute is reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review." *Kucana v. Holder*, 558 U.S. 233, 251 (2010) (internal quotation marks omitted). This substantive canon – upon which YNHH leans heavily, and to which the district court gave significant weight – does none of the work that YNHH needs it to do.

YNHH suggests that the traditional presumption favoring review of agency actions should put a thumb on the scale from the very outset of our interpretative process – i.e., that it should factor not only into our resolution of any ambiguity we might ultimately find in section 1395ww(r)(3), but also into our assessment of whether the statute is ambiguous in the first place. To that end, YNHH argues that the presumption requires us to "construe[]" section 1395ww(r)(3) "narrowly,"

33

so as not to "encompass[] procedural aspects involved in the adoption of" the Secretary's decision to include or exclude certain data as part of the "estimates." YNHH Br. at 38 (quoting J. App'x at 47).  We disagree on both counts.

To be sure, the Supreme Court stated over thirty-five years ago that "[w]e *begin* with the strong presumption that Congress intends judicial review of administrative action." *Mich. Acad. of Fam. Physicians*, 476 U.S. at 670 (emphasis added).  But the Court has more recently clarified that such a presumption kicks in only if there is "*lingering* doubt about the proper interpretation" of the review-preclusion statute at issue.  *Kucana*, 558 U.S. at 251 (emphasis added).  Like "any" of the substantive canons, then, the presumption favoring review should "only serve[] as an aid for resolving an ambiguity" at "the end of the process of construing what Congress has expressed."  *Callanan v. United States*, 364 U.S. 587, 596 (1961).  It is not, as YNHH would suggest, "to be used to beget [an ambiguity]," or to "come[] into operation at . . . the beginning [of our interpretative process] as an overriding consideration."  *Id.*; *see also Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005) ("Only if we discern ambiguity" *after* having considered "the [statutory] language itself, the specific context in which that language is used, and the broader context of the statute as a whole," do we

"resort . . . to canons of statutory construction." (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997))).

And the Supreme Court has cautioned that even if *some* ambiguity remains "after seizing everything from which aid can be derived," the "mere possibility of articulating a narrower construction" of a statute may not suffice to trigger substantive canons like the presumption favoring review. *Muscarello v. United States*, 524 U.S. 125, 138 (1998) (citations omitted). Rather, only a "*grievous* ambiguity or uncertainty in the statute" – a situation in which "we can make no more than a guess as to what Congress intended" – would suffice to trigger the presumption. *Id.* at 138–39 (emphasis added; internal quotation marks omitted).

Even more fundamental than YNHH's misunderstandings of when the presumption favoring review kicks in, or of the degree of ambiguity required for it to kick in, is YNHH's misunderstanding of the *kind* of ambiguity to which it pertains. In YNHH's view, the effect of the presumption is that section 1395ww(r)(3) "must be construed narrowly" with respect to the scope of the *types of challenges* it bars – i.e., construed to "encompass[]" only substantive challenges, but not "procedural" ones. YNHH Br. at 38 (quoting J. App'x at 47). But the consistent emphasis of the Supreme Court caselaw applying the

35

presumption has been that we must find "clear and convincing evidence" of "congressional intent to preclude judicial review" – rather than lightly inferring such intent from "slender and indeterminate evidence," or by subtle "implication" – before construing a statute to do so. *Mich. Acad. of Fam. Physicians*, 476 U.S. at 671, 673–74, 681 (citations omitted); *see also, e.g.*, *Kucana*, 558 U.S. at 252; *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 64 (1993); *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 483–84 (1991). There is nothing in the Supreme Court's or our caselaw to suggest that courts are permitted, much less required, to read in extratextual limitations on the *scope* of provisions in which Congress has clearly and unambiguously manifested its preclusive intent. And in the limited instances where the Supreme Court *has* used the vocabulary of "narrowing" to describe the effect of the presumption favoring review, its emphasis has been on "narrow[ing] the *category of [agency] actions* considered . . . to be exempted from review" – not the *types of challenges* from which such actions may be immunized. *Mich. Acad. of Fam. Physicians*, 476 U.S. at 672 n.3 (emphasis added; citation and alteration omitted).

Here, the Hospital does not dispute that Congress expressed a clear intent to preclude judicial review of the category of agency action at issue: "estimate[s]

36

of the Secretary." 42 U.S.C. § 1395ww(r)(3)(A). Nor could it. As our sister circuits have persuasively explained, Congress's preclusive intent is clear, both on the face of section 1395ww(r)(3)'s text and from the surrounding context of the Medicare Act's statutory scheme. *See, e.g.*, *DCH Reg'l Med. Ctr.*, 925 F.3d at 505–06 ("When Congress provides that 'there shall be no administrative or judicial review' of specified agency actions, its intent to bar review is clear . . . ." (internal citation omitted)); *Fla. Health Scis. Ctr.*, 830 F.3d at 518 (holding that the "language" of section 1395ww(r)(3) "unequivocally precludes review of the agency action that falls within" the statutory definition of "[a]ny estimate of the Secretary" (internal quotation marks omitted)); *Tex. All. for Home Care Servs. v. Sebelius*, 681 F.3d 402, 409 (D.C. Cir. 2012) ("[T]hat there be '*no* administrative or judicial review' under [section 1395ff, section 1395*oo*,] '*or otherwise*' unequivocally precludes review of the Secretary's actions [and] . . . . manifest[s] the Congress's intent to proceed with these initial administrative processes without risk of litigation blocking the execution of the program." (emphasis in original; citation omitted)); *Paladin Cmty. Mental Health Ctr. v. Sebelius*, 684 F.3d 527, 531 n.3 (5th Cir. 2012) ("Judicial determinations forcing the Secretary to retroactively alter payment[s] [to hospitals under the Medicare Act] . . . that are adjusted annually . . . would likely wreak

37

havoc on the already complex administration of Medicare['s] . . . payment system.").

*          *          *

At bottom, section 1395ww(r)(3) is "susceptible" to neither the *kind* of ambiguity, nor the *degree* of ambiguity, that would be necessary for YNHH to invoke the presumption favoring review as a tiebreaker. *Kucana*, 558 U.S. at 251. And we are unpersuaded by the Hospital's attempt to use it as a stalking horse for efforts "to beget [an ambiguity]," *Callanan*, 364 U.S. at 596, that simply does not appear on the face of "the language [of section 1395ww(r)(3)] itself," from "the specific context in which that language is used," or from "the broader context of the [Medicare Act] as a whole," *Daniel*, 428 F.3d at 423 (quoting *Robinson,* 519 U.S. at 341).

Congress has "unequivocally preclude[d]" us, *Fla. Health Scis. Ctr.*, 830 F.3d at 518, from performing "judicial review" of "[a]ny estimate of the Secretary," 42 U.S.C. § 1395ww(r)(3)(A), including the Secretary's "estimate[]" of "the amount of uncompensated care for [each DSH-qualifying] hospital," *id.* § 1395ww(r)(2)(C)(i). Congress has expressly defined that "estimate[]" to comprise the Secretary's "determin[ation]" of the most "appropriate data" to "use" as a "proxy for the costs

of [qualifying] hospitals for treating the uninsured." *Id.* Thus, "we cannot review the Secretary's choice of data" – full stop. *Fla. Health Scis. Ctr.*, 830 F.3d at 518. We may not "inquire whether" the Secretary's choice of data was the result of a "procedurally defective" notice-and-comment rulemaking process any more than we may question actions by the Secretary that were "arbitrary, capricious," or otherwise *substantively* "defective." *Amgen*, 357 F.3d at 113. We therefore hold that section 1395ww(r)(3)(A) plainly and explicitly strips us – and the district court below – of subject-matter jurisdiction to consider the merits of YNHH's challenge here.

## B.      Ultra-Vires Jurisdiction

Finally, YNHH argues that even if its challenge is precluded by section 1395ww(r)(3), we still have inherent authority under *Leedom v. Kyne*, 358 U.S. 184 (1958), to review the Secretary's exclusion of the St. Raphael data as ultra vires conduct exceeding the scope of his authority or violating his clear statutory mandate. This argument plainly fails. An ultra-vires claim under *Kyne* is only available in the "extremely limited" circumstance

> when three requirements are met: (i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory.

39

*DCH Reg'l Med. Ctr.*, 925 F.3d at 509 (internal quotation marks omitted). Since section 1395ww(r)(3) *expressly* precludes review of the Secretary's rulemaking procedures, YNHH's ultra-vires challenge fails based on the first *Kyne* requirement. *See id.*

## IV. Conclusion

For the foregoing reasons, we **REVERSE** the district court's denial of the Secretary's motion to dismiss YNHH's procedural challenge for lack of subject-matter jurisdiction; **VACATE**, for lack of subject-matter jurisdiction, the district court's grant of summary judgment for YNHH on its procedural challenge; **REMAND** the case to the district court with instructions to dismiss the remainder of YNHH's action for lack of subject-matter jurisdiction; and **DISMISS AS MOOT** YNHH's cross-appeal disputing the district court's chosen remedy of remand without vacatur.